Argued and submitted May 10, decision of Court of Appeals pertaining to non-farm-use carriers reversed, remainder otherwise affirmed, and judgment of circuit court affirmed December 15, 2005

AMERICAN TRUCKING ASSOCIATIONS, INC.,
a District of Columbia Corporation,
CRST, Inc.,
an Iowa corporation,
USF Reddaway Inc.,
an Oregon corporation,
Kenneth E. Mansigh Trucking, Inc.,
a Washington corporation, and
Veneer Chip Transport, Inc.,
a Washington corporation,
on behalf of themselves and all other
similarly-situated weight-distance taxpayers,
*Respondents on Review,*

*v.*

STATE OF OREGON,
Department of Transportation
and Grace Crunican,
Director,
Department of Transportation,
*Petitioners on Review,*

*and*

AAA OREGON/IDAHO,
an Oregon corporation,
*Intervenor-Petitioner on Review.*

(CC 00C16242; CA A117694; SC S51622, S51623)

124 P3d 1210

David E. Leith, Assistant Attorney General, Salem, argued the cause for petitioners on review. With him on the briefs were Mary H. Williams, Solicitor General, and Hardy Myers, Attorney General.

Robert Digges, J., *pro hac vice*, Alexandria, Virginia, argued the cause for respondents on review. Justin M. Thorp, and Jonathan M. Hoffman, of Martin, Bischoff, Templeton, Langslet Hoffman LLP, Portland, filed the briefs for respondents on review.

Scott G. Seidman, of Tonkon Thorp LLP, Portland, argued the cause for intervenor-petitioner on review. With him on the briefs were Paul W. Conable and Christine L. Uri.

DE MUNIZ, J.

## DE MUNIZ, J.

The issue in this case is whether the Oregon "flat fee" highway tax alternatives that are available to heavy trucks hauling certain commodities in either interstate or intrastate commerce violate the Commerce Clause of the United States Constitution.[1] American Trucking Associations, Inc., and several other trucking companies (plaintiffs) sought a judgment declaring, among other things, that the provisions of ORS 825.480(1), (4), and (5)[2] that offer a flat-fee

---

[1] Article I, section 8, clause 3, of the United States Constitution grants Congress the authority to "regulate Commerce * * * among the several States[.]" The United States Supreme Court has interpreted that provision as imposing restrictions on state taxes, fees, or regulations that discriminate against or unduly burden interstate commerce. *See Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 US 175, 179, 115 S Ct 1331, 131 L Ed 2d 261 (1995) ("we have consistently held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject").

[2] Plaintiffs filed their first Amended Complaint in December 2000 under the 1999 version of ORS 825.480. With the exception of a rate increase implemented in 2003, however, the text of that provision has remained the same. Because the operative text has not changed since 1999, we use the current version of ORS 825.480 throughout this opinion. That version of the statute provides, in part:

"(1)(a) In lieu of other fees provided in ORS 825.474, carriers engaged in operating motor vehicles in the transportation of logs, poles, peeler cores or piling may pay annual fees for such operation computed at the rate of six dollars and ten cents for each 100 pounds of declared combined weight.

"(b) Any carrier electing to pay fees under this method may, as to vehicles otherwise exempt from taxation, elect to be taxed on the mileage basis for movements of such empty vehicles over public highways whenever operations are for the purpose of repair, maintenance, servicing or moving from one exempt highway operation to another.

"* * * * *

"(4)(a) In lieu of other fees provided in ORS 825.474, carriers engaged in the operation of motor vehicles equipped with dump bodies and used in the transportation of sand, gravel, rock, dirt, debris, cinders, asphaltic concrete mix, metallic ores and concentrates or raw nonmetallic products, whether crushed or otherwise, moving from mines, pits or quarries may pay annual fees for such operation computed at the rate of six dollars and five cents for each 100 pounds of declared combined weight.

"(b) Any carrier electing to pay fees under this method may, as to vehicles otherwise exempt for taxation, elect to be taxed on the mileage basis for movements of such empty vehicles over public highways whenever operations are for the purpose of repair, maintenance, servicing or moving from one exempt highway operation to another.

"(5)(a) In lieu of other fees provided in ORS 825.474, carriers engaged in operating motor vehicles in the transportation of wood chips, sawdust,

tax option to certain non-farm-use carriers, as well as similar provisions for farm-use trucks, violated the Commerce Clause. Plaintiffs also sought injunctive relief and a refund of taxes paid pursuant to those provisions. Defendants in the case are the Oregon Department of Transportation and its director, as well as intervenor-petitioner AAA Oregon/Idaho. The trial court dismissed plaintiffs' action below. The Court of Appeals subsequently affirmed that judgment as to the flat-fee alternatives for farm-use trucks, but reversed regarding the tax alternatives for non-farm-use trucks. The Court of Appeals concluded that the flat-fee alternatives for non-farm-use carriers violated the Commerce Clause by creating a fee structure that had a discriminatory effect on trucks engaged in interstate commerce. *American Trucking Assns., Inc. v. State of Oregon,* 193 Or App 185, 90 P3d 15 (2004). We allowed defendant's petition for review and now reverse the Court of Appeals decision as it pertains to non-farm-use carriers, otherwise affirm the remainder of that decision, and affirm the trial court's judgment.

We take the relevant facts from the opinion of the Court of Appeals.

"The primary method under which Oregon taxes heavy trucks that use its highways is a weight-mile tax. ORS 825.450-825.555. Under that tax, a trucking carrier pays a rate for each mile that its trucks operate on the state's public highways. The tax is based on the weight that the carrier declares to be the truck's maximum legal weight; the higher the declared weight, the higher the per-mile tax for that truck. ORS 825.474-825.476. A truck that pays the weight-mile tax does not pay the fuel tax that the state charges other vehicles and may take any fuel tax paid as a credit against the weight-mile tax. ORS 825.486. A carrier must maintain records of the declared weights of its trucks and

barkdust, hog fuel or shavings may pay annual fees for such operation computed at the rate of twenty-four dollars and sixty-two cents for each 100 pounds of declared combined weight.

"(b) Any carrier electing to pay under this method may, as to vehicles otherwise exempt from taxation, elect to be taxed on the mileage basis for movement of such empty vehicles over public highways whenever operations are for the purpose of repair, maintenance, service or moving from one exempt highway operation to another."

the miles that they travel in order to make the required reports and calculate the amount of tax owed.

"Plaintiffs do not question the constitutionality of the weight-mile tax itself. Rather, they attack two exceptions to it.[3] The first exception concerns the flat fee options provided in ORS 825.480 for certain commodities. That statute gives carriers of three categories of commodities—logs, sand and gravel carried in dump trucks, and wood chips— the option to choose to pay a flat fee rather than the weight-mile tax. ORS 825.480(1), (4), and (5). For each commodity, the legislature established the fee at an amount that it believed to be identical to what a truck of the same weight carrying that commodity would pay in weight-mile tax if it operated as many miles per year as an average truck that carried that commodity. *The calculations are based on the assumption that the truck in question operates entirely in Oregon.* The flat fee option is available to carriers who are located in Oregon or any other state. The legislature has adjusted the amounts a number of times in order to reflect changes in the average mileage and in the weight-mileage rates since it originally adopted the flat fee options. If a carrier elects a flat fee option, it must do so for all the trucks in its fleet that carry that commodity, and it may make that election only once per year. ORS 825.480(2). A carrier that chooses to pay a flat fee must still report the mileage that it travels on public highways, OAR 740-055-0120; however, because those reports do not affect the taxes that the carrier pays, the state does not audit them.

"Trucks carrying commodities that have a flat fee option are more likely than trucks carrying other commodities to use nonpublic roads for significant portions of their trips, to use lesser-traveled public roads, and to make multiple short journeys. All of those factors make it more difficult for carriers to keep the records that the weight-mile tax requires and for the state to enforce the tax. Flat fee carriers also tend to be small operators, for whom record-keeping is especially burdensome. Thus, one purpose of the flat fee option is to ease the burden on both the carriers and

---

[3] The second weight-mile tax exception at issue on appeal involved the exception for farm vehicles set forth in ORS 825.480(3). As already noted above, the Court of Appeals affirmed the trial court's judgment regarding that issue, and the parties have not raised it on review. Consequently, we do not address that issue here.

the state of administering and enforcing the weight-mile tax.

"Although the legislature intended the flat fee options to be revenue neutral, they are not, at least for haulers of logs or of sand and gravel. The best estimates, based on data that are not fully reliable, are that, for the most recent period for which figures were available at the time of trial, wood chip carriers who chose the flat fee option as a group paid $27,315.75 more than they would have paid under the weight-mile tax, while sand and gravel carriers paid $276,535.86 less and log carriers paid $1,164,585.86 less. For sand and gravel carriers, the underpayments are equivalent to 1.34 cents per mile, while for log carriers they are equivalent to 1.9 cents per mile. For purposes of comparison, the average profit margin in the trucking industry is 3 cents per mile."

193 Or App at 188-90 (footnote omitted; emphasis added).

On appeal, plaintiffs argued, in part, that, under *American Trucking Assns., Inc. v. Scheiner*, 483 US 266, 107 S Ct 2829, 97 L Ed 2d 226 (1987), the highway fees at issue were malapportioned and therefore discriminatory in their practical effect. Specifically, plaintiffs argued that *Scheiner* supported the notion that the Oregon flat-fee tax options for trucks carrying logs, sand and gravel, or wood chips impermissibly exerted a "hydraulic pressure" on out-of-state motor carriers hauling those commodities to concentrate their activities in-state to fully take advantage of the flat-fee system. That was so, plaintiffs maintained, because any advantage to be obtained under the flat-fee system—presumably by driving more miles within Oregon than outside of it—would invariably be more available to an Oregon-based motor carrier than to an out-of-state carrier. The result, plaintiffs maintained, was inherently discriminatory.

The Court of Appeals agreed. Drawing on *Scheiner*'s iteration of the Supreme Court's "internal consistency" test,[4] the Court of Appeals set out the following hypothetical scenario:

[4] The "internal consistency" test is a component of the framework used to determine whether state-levied taxes and fees affecting interstate commerce have been fairly apportioned. The test is discussed in greater detail below.

"Here, the focus is on carriers whose trucks travel more miles in Oregon than the amount that the legislature presumed. As one example, assume that the weight-mile tax for a particular truck is 10 cents per mile, that the legislature presumes that the average truck carrying the commodity involved will travel 40,000 miles per year in Oregon, and that the legislature has therefore set an alternative flat fee at $4,000 per year. Carrier A has trucks that actually travel 50,000 miles entirely in Oregon; it elects to pay the flat fee and therefore pays $4,000 per truck, or an effective rate of 8 cents rather than 10 cents per mile. Carrier B has trucks that also operate 50,000 miles, but they operate half the time in Oregon and half the time in other states with identical tax systems. Carrier B would lose money by electing to pay the flat fee in any state that has such a taxing scheme because the flat fee is calculated on an amount of mileage greater than its trucks will travel in any one state. Thus, economic necessity requires carrier B to elect to be taxed on the basis of its mileage, and its total taxes will be $5,000 per truck, or an effective rate of 10 cents per mile. Such a taxing scheme favors intrastate carriers over interstate carriers. Any other hypothetical situation, using any other figures for an unapportioned flat fee option, will show a similar malapportionment and discriminatory effect as to interstate carriers that exceed the presumed average mileage.

"In this hypothetical situation, the flat fee option will both exert pressure on the interstate carrier to change its operations to focus on intrastate business and will discriminate against the interstate carrier if it does not do so. Only by focusing on intrastate business can the carrier pay the lower tax rate that similarly situated intrastate carriers are able to pay. The flat fee options, thus, discriminate between interstate and intrastate carriers whose businesses differ only because of their relationship to state boundaries, and the discrimination operates to the detriment of the interstate carrier. The flat fee options do not apportion the tax burden among the states where the interstate carrier operates, and they therefore fail the 'internal consistency' test."

*American Trucking*, 193 Or App at 195-96 (footnotes omitted). As a result, the Court of Appeals concluded that the flat-fee options before it violated the Commerce Clause and were therefore unconstitutional. This court subsequently accepted review to consider that constitutional issue.

Although the Commerce Clause is framed as an affirmative grant of commerce-regulating power to Congress, the United States Supreme Court has interpreted the clause to also embody an implicit negative command forbidding states from enacting laws that interfere with the flow of free trade across the nation. *See, e.g., Oregon Waste Systems, Inc. v. Environmental Quality of Ore.*, 511 US 93, 98, 114 S Ct 1345, 128 L Ed 2d 13 (1994) (Commerce Clause contains " 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden" interstate commerce). At the same time, the Court also has made clear that the Commerce Clause will not excuse interstate commerce from shouldering its fair share of state tax burdens as it makes its way:

> "[D]ecisions of this Court, particularly during recent decades, have sustained nondiscriminatory properly apportioned state corporate taxes upon foreign corporations doing an exclusively interstate business when the tax is related to a corporation's local activities and the State has provided benefits and protections for those activities for which it is justified in asking a fair and reasonable return."

*Complete Auto Transit, Inc. v. Brady*, 430 US 274, 287, 97 S Ct 1076, 51 L Ed 2d 326 (1977), *quoting Colonial Pipeline Co. v. Traigle*, 421 US 100, 108, 95 S Ct 1538, 44 L Ed 2d 1 (1975). The respective values underlying each of those ideas—the value of facilitating a free flow of commerce between the states and the value of making such commerce pay its way in the process—can, in practical application, often clash if not carefully regulated.

In seeking to maintain the boundaries that allow those frequently competing priorities to operate in harmony, we are faced, at the outset, with a problem common to most courts considering a Commerce Clause issue today: What is the proper analytical framework for examining the case at hand? That question stems, in part, from the plethora of different tests that the Supreme Court has created over the years to analyze state taxation and fee-setting measures that implicate interstate commerce.[5] The result, as the Court

---

[5] The following list is by no means exhaustive: *Oregon Waste Systems, Inc. v. Environmental Quality of Ore.*, 511 US 93, 114 S Ct 1345, 128 L Ed 2d 13 (1994) (facially different state treatment of in-state and out-of-state economic interests

itself has described it, often resembles a "quagmire" of differently phrased tests that rarely offer explicit guidance, outside of fact-matching, as to when and under what circumstances a particular test should be applied. *See, e.g., Quill Corp. v. North Dakota*, 504 US 298, 315, 112 S Ct 1904, 119 L Ed 2d 91 (1992) (noting that "our law in this area is something of a 'quagmire' "); *Scheiner*, 483 US at 280 (recognizing that past Commerce Clause decisions have been described as a " 'quagmire' of judicial responses"). Here, the question of how to analyze this Commerce Clause issue is particularly important because the parties begin by presenting this court with competing viewpoints on which test is the proper one to use.

Defendants urge us to analyze the fee scheme now before us as a "use" tax under the test set out in *Evansville-Vanderburgh Airport Authority District v. Delta Airlines*, 405 US 707, 92 S Ct 1349, 31 L Ed 2d 620 (1972). In *Evansville-Vanderburgh*, the Supreme Court considered whether the Commerce Clause allowed state and municipal governments to impose a $1.00 service charge for each passenger boarding commercial aircraft at local airports. Analogizing those charges to highway tolls, the Court ultimately upheld the constitutionality of such fees, articulating, in the process, the following test:

---

that benefit the former and burden the latter is *per se* invalid under Commerce Clause, unless state can show legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives); *Armco Inc. v. Hardesty*, 467 US 638, 644, 104 S Ct 2620, 81 L Ed 2d 540 (1984) (state tax does not discriminate in violation of Dormant Commerce Clause if it possesses internal consistency, *i.e.*, if same tax could be applied by every other state with no impermissible interference with free trade); *Complete Auto Transit, Inc. v. Brady*, 430 US 274, 97 S Ct 1076, 51 L Ed 2d 326 (1977) (state tax statute will be sustained against Commerce Clause challenge if taxed activity has a substantial nexus with the state and tax is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to services provided by state); *Evansville-Vanderburgh Airport Authority District v. Delta Airlines*, 405 US 707, 716-17, 92 S Ct 1349, 31 L Ed 2d 620 (1972) (state toll is constitutional when based on fair approximation of use or privilege to use that does not discriminate against interstate commerce and is not excessive in relation to benefits conferred, even though alternative formula might better reflect use of facilities by individual users); *Pike v. Bruce Church*, 397 US 137, 142, 90 S Ct 844, 25 L Ed 2d 174 (1970) (state regulation effectuating legitimate public purpose and having only incidental effect on interstate commerce will be upheld against Commerce Clause challenge unless burden imposed clearly exceeds local benefits; extent of burden tolerated depends on nature of local interest).

"At least so long as the toll is based on some fair approximation of use or privilege for use, as was that before us in *Capitol Greyhound [Lines v. Brice*, 339 US 542, 70 S Ct 806, 94 L Ed 1053 (1950)], and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users."

*Id.* at 716-17. Defendants argue that, because the flat-fee option is essentially an assessment for highway use with its proceeds dedicated to Oregon highways, the fee should be scrutinized as a use tax using the framework described above rather than the somewhat more stringent tests often applied to general revenue-raising measures.

In response, plaintiffs contend that the four-factor test of *Complete Auto Transit* represents the appropriate analysis to be applied here. At issue in *Complete Auto Transit* was a Mississippi tax statute that required all businesses engaged in transporting persons or property for hire to pay a percentage of gross income for the privilege of operating within the state. The Supreme Court upheld the tax against the out-of-state plaintiff's Commerce Clause challenge, relying on the consistency of its decisions sustaining similar taxes

"when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State."

430 US at 279. Plaintiffs point in particular to the fair apportionment and nondiscrimination elements of the test, arguing that whether a state tax or fee meets those two requirements is a matter further subject to a separate test for "internal consistency." Explaining the nature of internal consistency in *Armco Inc. v. Hardesty*, 467 US 638, 104 S Ct 2620, 81 L Ed 2d 540 (1984), the Supreme Court wrote:

"In *Container Corp. of America v. Franchise Tax Board*, 463 US 159, 169, 77 L Ed 2d 545, 103 S Ct 2933 (1983), the Court noted that *a tax must have 'what might be called internal consistency—that is the [tax] must be such that, if*

*applied by every jurisdiction,' there would be no impermissible interference with free trade.* In that case, the Court was discussing the requirement that a tax be fairly apportioned to reflect the business conducted in the State. A similar rule applies where the allegation is that a tax on its face discriminates against interstate commerce. A tax that unfairly apportions income from other States is a form of discrimination against interstate commerce."

*Id.* at 644 (emphasis added). Plaintiffs contend that the flat-fee option at issue here lacks internal consistency, rendering the fee malapportioned and discriminatory for purposes of interstate commerce and, therefore, unable to withstand constitutional scrutiny under the *Complete Auto Transit* test.

Although both tests appear to remain viable as Supreme Court precedents in that neither has been overruled by a subsequent decision, several factors weigh heavily in favor of using *Complete Auto Transit*'s analytical framework here rather than the *Evansville-Vanderburgh* test. First, aside from the *Evansville-Vanderburgh* case itself, the test articulated therein has never actually been used again by a majority of the Court to decide a Commerce Clause controversy. Following the *Evansville-Vanderburgh* decision, Congress

"concluded that the proliferation of local taxes burdened interstate air transportation, and, when coupled with the federal Trust Fund levies, imposed double taxation on air travelers. To deal with these problems, Congress passed § 7(a) of the Airport Development Acceleration Act of 1973[.]"

*Aloha Airlines, Inc. v. Director of Taxation of Hawaii,* 464 US 7, 9-10, 104 S Ct 291, 78 L Ed 2d 10 (1983) (footnote omitted). The new federal statute essentially nullified the effect of *Evansville-Vanderburgh* on air travel by prohibiting the states from levying any fee on individuals traveling by air or on the activities associated with transporting them. *Id.* at 10. Since then—perhaps out of an abundance of caution—none of the 12 Supreme Court cases citing *Evansville-Vanderburgh* has employed its test to resolve a Commerce Clause dispute.[6]

---

[6] The Supreme Court has, however, used the test for other purposes. In *Commonwealth of Massachusetts v. United States,* 435 US 444, 98 S Ct 1153, 55 L Ed 2d 403, (1978), the Court used the test—substituting the phrase "state

Second—in contrast to the *Evansville-Vanderburgh* framework—*Complete Auto Transit's* four-factor test represents an important shift in the Supreme Court's Commerce Clause jurisprudence and has seen regular and recent use. Prior to *Complete Auto Transit*, the old rule had been that state taxes levied on the "privilege" of doing business within a state were *per se* unconstitutional when applied to what was exclusively interstate commerce. *See Spector Motor Service v. O'Connor*, 340 US 602, 71 S Ct 508, 95 L Ed 573 (1951) (so stating). At the same time, the Court consistently had recognized that interstate commerce could be made to pay its way as it moved through the states. The result was that, by the time of *Complete Auto Transit*, the old rule had been stripped of most of its practical significance, and replaced, instead, with a formalistic exercise that often focused more on eliminating words such as "privilege" from commerce-related statutes rather than examining the statutes' practical effects. For example, under the old rule, the Supreme Court struck down a Virginia statute creating a "license tax" on gross business receipts levied for the "privilege of doing business" in the state. *See Railway Express Agency v. Virginia*, 347 US 359, 74 S Ct 558, 98 L Ed 757 (1954) (so holding). Several years later, the Court upheld an amended version of the same statute, reworded to impose a "franchise tax" on a business's "going concern" value as measured by its gross receipts. *See Railway Express Agency v. Virginia*, 358 US 434, 79 S Ct 411, 3 L Ed 2d 450 (1959) (so holding). In *Complete Auto Transit*, the Court recognized that no real economic difference had resulted from manipulating the wording of those statutes and that its old rule of *per*

---

function" for "interstate commerce"—to hold that a federal registration tax on civil aircraft did not violate the implied immunity of a state government from federal taxation. *In Northwest Airlines, Inc. v. County of Kent, Michigan*, 510 US 355, 114 S Ct 855, 127 L Ed 2d 183 (1994), the Court also used the test to ascertain whether fees assessed against commercial airlines for the use of a county's airport facilities were reasonable under the federal Anti-Head Tax Act. At the end of the day, the only other case in which a majority of the Court has used the *Evansville-Vanderburgh* test in a Commerce Clause context is *American Trucking Assns., Inc. v. Scheiner*, 483 US 266. In deciding *Scheiner*, however, the Court did not actually apply the *Evansville-Vanderburgh* test as its controlling rationale; instead, the Court relied upon the internal consistency test set out in *Armco*, 467 US at 644 for that purpose. The Court cited the *Evansville-Vanderburgh* test primarily to refute the State of Pennsylvania's argument that the taxes at issue in *Scheiner* were just like the user fees that the Court had upheld in *Evansville-Vanderburgh*.

*se* unconstitutionality had been reduced, in large part, to an axiom that often distracted courts from the more critical inquiry "into whether the challenged tax produced results forbidden by the Commerce Clause." 430 US at 285. The Court then expressly rejected its old rule. The four-factor test that replaced it was, if nothing else, an effort to better focus the judiciary on the actual concerns that the Commerce Clause was intended to address.

Since that time, to the extent that one test can be singled out as surfacing with regularity among Supreme Court Commerce Clause cases, *Complete Auto Transit*'s four-part analysis is conspicuous for having appeared with greater frequency and in a broader range of substantive applications than the *Evansville-Vanderburgh* test.[7] More importantly, the Court cited the *Complete Auto Transit* test with apparent approval in deciding *American Trucking Associations, Inc. v. Michigan Public Service Commission,* 545 US ____ , 125 S Ct 2419 (2005), the Court's most recent Commerce Clause decision. That case, like this one, concerned a flat-fee assessment on intrastate hauling. As a result of that similarity, along with the other reasons discussed above, we conclude that *Complete Auto Transit*'s four-factor test is the more appropriate analytical format for reviewing the issues presented here. Under that test, a state tax will survive Commerce Clause scrutiny if (1) the taxed activity has a sufficient nexus with the state to justify the tax; (2) the tax is fairly apportioned; (3) the tax does not discriminate against interstate commerce; and (4) the amount of the tax is fairly related to the benefits provided to the taxpayer.[8] 430 US at 279. We turn now to that inquiry.

---

[7] *See, e.g., Oklahoma Tax Commission,* 514 US 175 (applying test to sales tax on bus tickets); *Goldberg v. Sweet,* 488 US 252, 109 S Ct 582, 102 L Ed 2d 607 (1989) (applying test to tax on telephone calls); *D.H. Holmes Co. v. McNamara,* 486 US 24, 108 S Ct 1619, 100 L Ed 2d 21 (1988) (applying test to state use tax); *Container Corp. of America v. Franchise Tax Board,* 463 US 159, 103 S Ct 2933, 77 L Ed 2d 545 (1983) (applying test to franchise tax); *Commonwealth Edison Co. v. Montana,* 453 US 609, 101 S Ct 2946, 69 L Ed 2d 884 (1981) (applying test to severance tax).

[8] Although defendants argue that other tests are more appropriate, they have nevertheless presented alternative arguments using the four-factor analysis of *Complete Auto Transit* to support their positions on review.

As the parties have framed the issues on review, this case arguably implicates only the apportionment and discrimination prongs of the *Complete Auto Transit* analysis. On appeal, the Court of Appeals agreed with plaintiffs that, under *American Trucking Assns., Inc. v. Scheiner*, 483 US 266, and its application of the internal consistency test, the flat-fee option at issue here was both malapportioned and discriminatory. Plaintiffs now essentially urge this court to do the same. We turn first to the apportionment question.

In *Goldberg v. Sweet*, 488 US 252, 109 S Ct 582, 102 L Ed 2d 607 (1989), the Supreme Court stated that, with regard to interstate commerce, the requirement of proper apportionment is aimed at preventing individual states from taxing more than their fair share of an interstate transaction:

> "In analyzing these contentions, we are mindful that the central purpose behind the apportionment requirement is to ensure that each State taxes only its fair share of an interstate transaction."

*Id.* at 260-61. A state tax is fairly apportioned for purposes of interstate commerce if it is both internally and externally consistent. The parties do not contest the external consistency of the flat-fee option in this case.[9] Plaintiffs, however, argue that Oregon's flat-fee option lacks internal consistency.

To be internally consistent, "a tax must be structured so that if every State were to impose an identical tax, no multiple taxation would result." *Id.* at 261. To examine a tax for malapportionment, the internal consistency test essentially extrapolates a hypothetical application of the challenged state tax or fee across all the states and scrutinizes the results for signs of overreaching:

> "This test asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate. *A*

---

[9] External consistency focuses on the economic justification underlying a state's claims upon a particular value being taxed. *Oklahoma Tax Commission*, 514 US at 185. A tax that possesses external consistency will not reach beyond the value that is fairly attributable to the economic activity within the taxing state. *Id.* As noted above, the external consistency of the flat-fee option is not at issue here.

*failure of internal consistency shows as a matter of law that a State is attempting to take more than its fair share of taxes from the interstate transaction,* since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax."

*Oklahoma Tax Commission v. Jefferson Lines, Inc.*, 514 US 175, 185, 115 S Ct 1331, 131 L Ed 2d 261 (1995) (emphasis added).

■       Here, applying the internal consistency test, we discern no apportionment problem under the *Complete Auto Transit* analysis. The flat-fee option is aimed at operations that take place primarily in Oregon. If viewed as a tax, it is one imposed upon an activity that takes place exclusively within this state's borders. The flat fee does not tax an interstate truck's entry into this state, nor does it tax transactions spanning multiple states. As a result, if every state replicated Oregon's flat-fee tax option under the same terms, we cannot hypothesize a scenario where the interstate commerce in logs, sand and gravel, or wood chips would be subject to multiple taxation or could be viewed as one state's attempt to take more than its fair share of taxes from transactions involving those commodities.

That said, however, the remaining issue under the test set out in *Complete Auto Transit* is perhaps the most important: Does the flat-fee option at issue here nevertheless discriminate against interstate commerce? In concluding that it did, the Court of Appeals essentially melded the concepts of apportionment and discrimination together and assumed that, just as hypothetical projections could be used to show malapportionment under the internal consistency test, similar hypothetical projections could also be used to infer discrimination. Indeed, on review, plaintiffs assert that no record evidence is needed to prove that the flat-fee option is discriminatory here. Plaintiffs argue that the flat-fee option creates a forbidden incentive for trucking companies that do business in Oregon and elsewhere to concentrate their operations within this state; *Scheiner*, they contend, illustrates that such incentives alone are enough to violate the Commerce Clause.

In any event, plaintiffs contend that the record in this case clearly establishes discrimination in practical effect. Plaintiffs point in particular to trial court findings that show, according to a study done in 2000, that sand and gravel haulers utilizing the flat-fee option paid, in the aggregate, almost $300,000 less than they would have paid under the weight-milage alternative, while log haulers using the flat fee realized a similar savings of over $1 million. Noting that the flat-fee option is utilized almost solely by Oregon-based motor carriers that operate predominately or exclusively within the state, they argue that, as with all flat highway taxes, the flat-fee option inevitably will cost state-based, heavy users of Oregon's highways less per mile than the alternative weight-mile tax will cost interstate users who have less occasion to use Oregon roads. That result, they maintain, is inherently discriminatory. Those propositions, however, are incorrect for several reasons.

First, the Supreme Court has never viewed hypothetical possibilities, standing alone, as sufficient to constitute unconstitutional discrimination for Commerce Clause purposes:

> "On the contrary, we repeatedly have focused our Commerce Clause analysis on whether a challenged scheme is discriminatory in 'effect,' and we have emphasized that 'equality for the purposes of * * * the flow of commerce is measured in dollars and cents, not legal abstractions.' "

*Associated Industries of Missouri v. Lohman*, 511 US 641, 654, 114 S Ct 1815, 128 L Ed 2d 639 (1994) (internal citations omitted). Therefore, aside from laws discriminating against interstate commerce on their face, *see Fulton Corp. v. Faulkner*, 516 US 325, 331, 116 S Ct 848, 133 L Ed 2d 796 (1996) ("[s]tate laws discriminating against interstate commerce on their face are 'virtually *per se* invalid.' "), issues involving discrimination against interstate commerce must involve "substantial distinctions and real injuries." *Lohman*, 511 US at 654 (quoting *Gregg Dyeing Co. v. Query*, 286 US 472, 481, 52 S Ct 631, 76 L Ed 1232 (1932)). The flat-fee option here, of course, does not facially discriminate against interstate commerce. Interstate and intrastate operations alike are free to either pay the weight/mile tax or the flat fee

if they haul commodities covered by ORS 825.480. In short, eligibility for the flat fee is determined solely by the commodities hauled, not by the location of the carrier.

Second, plaintiffs' assertion that the Supreme Court's finding of discrimination in *Scheiner* was not a fact-based determination misapprehends the record that was before the Court in that case. At issue in *Scheiner* were two different Pennsylvania flat-tax schemes. 483 US at 273-75. Both were levied on all commercial trucks operating in the state in return for the privilege of using the state's highways. The Court noted that, facially, the taxes did not discriminate between in-state and out-of-state trucks in allocating tax burdens. *Id.* at 281. Based on the evidence before it, however, the Court found that the Pennsylvania-based trucks subject to the flat taxes traveled approximately five times as many miles within Pennsylvania as did their out-of-state counterparts. *Id.* at 276. Correspondingly, the Court found that, based on the record before it, the cost per mile of those taxes was approximately five times as high for out-of-state trucks as for local vehicles. *Id.* It was that evidentiary record that rendered the Pennsylvania taxes "plainly discriminatory," *id.* at 286, not, as plaintiffs suggest, a hypothetical construct.

■    Here, in contrast, plaintiffs present no evidence of an actual burden placed on interstate commerce by Oregon's flat-fee option, or any instance where use of the flat fee has, in fact, discriminated against interstate commerce. Plaintiffs point only to the aggregate savings realized under the flat fee as evidence of discriminatory effect. Unlike the plaintiffs in *Scheiner*, however, plaintiffs do not break those figures down between in-state and out-of-state trucking operations, or otherwise show how the aggregate savings serve to set the two groups apart. As a result, to find discrimination against interstate commerce in this case, we would be forced to assume that out-of-state trucking operations somehow had been denied access to benefits otherwise available to intrastate trucking firms and, therefore, had not contributed to the aggregate savings figures found by the trial court. Nothing in the record, however, supports that finding.[10]

---

[10] The record, in fact, suggests the opposite. As the trial court noted in its findings of fact, out-of-state sand and gravel carriers accounted for only 13.33 percent

Consequently, there is nothing to show that the flat-fee option before us effectively has created an unconstitutionally protected trade area that prefers local commerce over interstate commerce.

Finally, the Supreme Court's recent decision in *Michigan Public Service Commission*, 545 US ___ , 125 S Ct 2419, effectively refutes plaintiffs' argument regarding the general discriminatory effect of locally focused flat fees. At issue in *Michigan Public Service Commission* was a $100 dollar annual state fee levied on all trucks in Michigan making intrastate deliveries. The primary plaintiff in that case, American Trucking Associations, Inc.—the same primary plaintiff in the case now before this court—argued, much as it does here, that the fee in question was discriminatory because trucking companies that worked solely within Michigan would drive far more miles within the state than their counterparts that also made interstate deliveries, thereby obtaining a greater cost-per-mile benefit from the fee than the interstate haulers. Those financial incentives, the plaintiffs argued, would exert an impermissible "hydraulic pressure" on out-of-state truckers to concentrate their hauling in Michigan. The Supreme Court rejected that argument, however, concluding, as the Michigan Court of Appeals had pointed out, that, without more, the record contained little, if any, evidence of a significant practical burden on interstate commerce. *Id.* at 2423-24.

The same is true here. If nothing else, *Michigan Public Service Commission* makes clear that plaintiffs cannot rely on hypothetical assertions to establish the existence of discriminatory economic effects; plaintiffs must demonstrate actual discrimination. If plaintiffs' arguments to the contrary were well-taken, not only would the Supreme Court have reached a different outcome in *Michigan Public Service Commission*, but virtually every uniformly assessed local fee would be in jeopardy if it touched some aspect of interstate

---

of Oregon's total flat-fee sand and gravel mileage logged during 2000. At the same time, those same out-of-state carriers garnered 31 percent of the overall savings attributed to sand and gravel haulers as a whole. Translated into savings-per-mile, the out-of-state haulers saved an average of four cents per mile compared to weight-mile taxpayers, while in-state sand and gravel carriers saved an average of 1.5 cents per mile.

commerce. That, of course, is not the aim of the Commerce Clause. *See, e.g., Commonwealth Edison Co. v. Montana*, 453 US 609, 623-24, 101 S Ct 2946, 69 L Ed 2d 884 (1981) (Dormant Commerce Clause does not seek "to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing business."). Having been presented with no evidence of discrimination or malapportionment in this case aside from plaintiff's hypothetical projections, we cannot conclude, on this record, that the flat-fee option at issue here violates the Commerce Clause.

The decision of the Court of Appeals pertaining to non-farm-use carriers is reversed, the remainder is otherwise affirmed, and the judgment of the circuit court is affirmed.